1
2
3
4                    **UNITED STATES DISTRICT COURT**
5                        **DISTRICT OF NEVADA**
6
7    VIELKA D. GORRIZ,                    )
8                          Plaintiff,     )        Case No. 2:15-cv-01405-LDG-GWF
                                          )
9    vs.                                  )        **REPORT AND**
                                          )        **RECOMMENDATION**
10   CAROLYN W. COLVIN,                   )
     Acting Commissioner of Social Security, )
11                                        )
12                         Defendant.     )
     _____ )
13           This case involves judicial review of administrative action by the Commissioner of Social

14   Security denying Plaintiff Vielka Gorriz's claim for disability benefits under Title II of the Social

15   Security Act.  Plaintiff filed her Complaint on July 23, 2015.  (ECF No. 1).  The Acting

16   Commissioner filed her Answer (ECF No. 9) and a copy of the Administrative Record (ECF No.

17   10) on October 29, 2015.  Plaintiff filed her Motion for Reversal and/or Remand (ECF No. 13) on

18   November 30, 2015.  The Commissioner filed her Cross-Motion to Affirm and Response to

19   Plaintiff's Motion for Reversal (ECF No. 15) on December 29, 2015 and Plaintiff filed her Reply

20   (ECF No. 18) on January 19, 2016.  This matter has been submitted to the undersigned United

21   States Magistrate Judge for Findings and Recommendations.

22                               **BACKGROUND**

23        **A.    Procedural History.**

24           On October 3, 2012, Plaintiff filed an application for a period of disability and/or insurance

25   benefits under Title II and Part A of Title XVIII of the Social Security Act.  *See* Administrative

26   Record ("AR") 140-146.  The Social Security Administration denied Plaintiff's initial application

27   on October 31, 2012.  AR 87-90.  Plaintiff then filed for reconsideration, which was denied on

28   March 20, 2013.  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") on

1    March 27, 2013.  AR 97-98.  Plaintiff testified at the hearing before ALJ Barry Jenkins on

2    December 4, 2013.  AR 21-57.  Vocational expert Valerie Williams also testified at the hearing.

3    AR 21-57.  The ALJ determined that Plaintiff was not disabled from January 15, 2007 through the

4    date Plaintiff was last insured, March 31, 2008.  AR 8-16.  Plaintiff filed her request for review to

5    the Appeals Council on March 20, 2014.  AR 4.  The Appeals Council denied Plaintiff's request for

6    review on June 9, 2015.  AR 1-3.  Plaintiff timely filed this action for judicial review pursuant to 42

7    U.S.C. § 405(g).

8            **B.    Factual Background**

9            **1. Plaintiff's disability/work history reports and hearing testimony**

10           Plaintiff was born on February 8, 1957 and was 56 years old at the time of the December 4,

11   2013 hearing.  AR 140.  Plaintiff completed high school and some college, but did not earn a

12   degree.  AR 29.  She was employed as an assistant director of housekeeping from 2004 to 2007.

13   AR 31, 172.  Prior to that, she worked as a floor manager in the housekeeping department of a hotel

14   from 1994 to 1998.

15           In her October 3, 2012 disability report, Plaintiff alleged that the onset date of her disability

16   was January 15, 2007 which was the same day she stopped working.  AR 159.  In another undated

17   disability report, Plaintiff stated that "right & left knee replacements" and "back surgery" were

18   physical conditions that limited her ability to work.  She stated that she weighed 175 pounds and

19   was 5 feet, 1 inches tall.  AR 163.  Plaintiff completed a Social Security Administration Function

20   Report - Adult in December 2012, in which she stated that her condition limited her ability to work

21   because she "can not be seated for a long period of time," and "can not be working for a long

22   period of time."  AR 193.  She reported that she could drive and go out alone.  She stayed at home,

23   but would go to the store with her husband.  She did not prepare meals because she could not

24   "[stand] in the kitchen for a long time."  AR 195.  She could pay bills, count change, handle a

25   savings account, and use a checkbook or money orders.  Plaintiff listed swimming as a hobby or

26   interest and stated that it was very good exercise for her back.  For social activities, she listed

27   talking and reading. She read while lying in bed.  She did not go out for social activities.  AR 197.

28           Plaintiff stated that her medical condition affected her ability to lift, squat, bend, stand,

2

walk, sit, kneel, and climb stairs.  AR 198.  She could lift five pounds.  She could not walk far due to the pain.  She was able to follow spoken instructions, and handle stress and changes in routine very well.  She was able to get along with authority figures.  AR 198-199.  She reported that she used a walker that was prescribed by her doctor after a recent back surgery.  AR 199.  Plaintiff stated that she could stand or sit for 15 minutes before she needed to either again sit or stand.  During the day she spent 50% of the time lying down.  She sat with her feet elevated 100% of the time.  In a 30 day period, she had 30 bad days in which she functioned very poorly and failed to complete most living and home care activities.  AR 200.

Plaintiff completed a pain questionnaire on December 3, 2012 in which she stated that she was constantly in pain and that her pain increased when she was lying down, sitting, rising from sitting, standing, and walking.  AR 188.  She had undergone back fusion surgery two weeks prior to completing the pain questionnaire.  Her pain made it impossible for her to walk one block, to lift 10 pounds, or sit for half an hour.  AR 190.  Pain also prevented her from getting enough sleep.  Her pain did not cause her to become anxious, worried, or depressed.  Plaintiff submitted an updated medical condition report on April 5, 2013 in which she stated that her back condition was the same, "[t]he pain is very strong."  She was taking oxycodone-acetaminophen and ciclobenzaprine.  AR 208.  She had an appointment scheduled for April 10, 2013 to determine whether she would have a stimulator implanted in her back to relieve her pain.  AR 209.

Plaintiff testified at the hearing on December 4, 2013 that she could not work because she was in pain 24 hours a day.  AR 36.  She was in pain regardless of whether she was sitting, lying down, or standing.  Pain medication helped only temporarily.  She stated that she did not receive the stimulator because her insurance company would not pay for it.  AR 37.  She wore a back brace, but did not use a cane or walker.  AR 39.  If she shifted back and forth on her feet, she could stand for about 20 minutes, but the pain was always present.  AR 45.  She could sit for 30 to 45 minutes and could walk for perhaps 20 minutes.  AR 45.  Consistent with her prior written reports, Plaintiff testified that she stopped driving in 2011.  She went to the store every day with her husband for about 45 minutes.  AR 41.  She also went to doctor's appointments and the post office with her husband.  On a typical day, she would read, walk inside her apartment, and take baths.

She was enrolled in a free online history course and spent about four hours a day studying on her ipad while lying down. Her husband performed the cooking and housework. AR 44.

Plaintiff testified that she obtained the most relief from pain by taking hot baths. AR 45. She took 25 minute hot baths approximately three times a day. She also stretched approximately every hour and did 5 minute stretching exercises approximately three times a day. AR 46. Plaintiff testified that she had lumbar fusion surgery in 1999. AR 48. Her doctor advised her that the surgery would help for a couple of years, but that the pain would return. She testified that this is what happened. She stated that "they cannot do anything else because I have too many wires inside my back." AR 48.

Under questioning by the ALJ, Plaintiff testified as follows:

> Q.  Okay. Has your back pain gotten worse? At what point would you say it's gotten worse?
>
> A.  I really don't know why.
>
> Q.  When did it become worse?
>
> A.  When did it start getting worse?
>
> Q.  Yeah.
>
> A.  Maybe in 2010. I really don't know exactly the time, I don't remember, but all the time it's getting worse.
>
> Q.  In 2010?
>
> A.  I don't remember when, but I know that a coupe of years ago every time it's worse now.

AR 52.

**2. Vocational Expert's Testimony**

Vocational Expert Valerie Williams testified that Plaintiff's prior jobs as a Floor Housekeeping Supervisor and Assistant Director of Housekeeping were at the light exertional level. AR 14, 49-51. The ALJ asked the vocational expert the following hypothetical question:

> If we had a person then of the claimant's age, education, and experience being capable of working at a light exertional level, however all posturals would be occasional, except the person could

. . .

. . .

4

1

2
> never climb ropes, ladders, or scaffolds, and she would need to avoid
> concentrated exposure to extreme cold, could such a person perform
> the claimant's past relevant work?

3   AR 51.

4   Ms. Williams testified that the hypothetical person could perform Plaintiff's past relevant

5   work.  The ALJ asked the whether the hypothetical person would be able to perform any other work

6   at the light exertional level.  AR 51.  Ms. Williams testified that the person could perform the jobs

7   of ticket taker, parking lot attendant, and bench assembler.  The person could also perform the

8   following sedentary jobs:  Surveillance system monitor, order clerk, and document preparer.  AR

9   51-52.  Plaintiff's counsel asked the vocational expert whether Plaintiff could perform her past

10  work or the other light or sedentary jobs if she needed to take unscheduled five minute breaks every

11  hour in addition to her regular work breaks.  AR 53.  Ms. Williams testified that Plaintiff would

12  still be able to perform the jobs.  She would not be able to work, however, if she needed to take

13  three additional unscheduled breaks per day, each lasting more than 20 minutes.  AR 53-54.

14  **3.  Medical Records.**

15  Plaintiff was seen by Rita Bella Chuang, M.D. from December 22, 2005 through January 2,

16  2007.  AR 215-222.  Plaintiff initially complained of pain in her right knee.  AR 222.  On October

17  18, 2006, Plaintiff complained of low back pain, noting that she had back surgery in 1999.  AR

18  218.  She continued to complain of low back pain on November 1, 2006.  AR 217.

19  Dr. Andrew Scott Martin, orthopedic surgeon, performed total knee replacement surgery on

20  Plaintiff's right knee in May 2006.  AR 231-232.   Plaintiff was seen in follow-up on June 26, 2006

21  at which time she was "ready to go back to work."  She was doing very well with her right knee and

22  had no complaints.  AR 247.  During a follow up visit on September 19, 2006, Plaintiff reported

23  that she was continuing to do well with her right knee.  However, she was now having increasing

24  pain in her left knee.  AR 246.

25  Plaintiff saw Dr. Michael Fishell at Advanced Pain Care on November 29, 2006.  Plaintiff

26  complained of low back pain and lower extremity discomfort which she reported that she had

27  experienced for a period of years.  She stated that her back pain was "quite pressing" and was

28  always the same.  It was worse at night time when she was lying flat on her back.  It could be made

worse by physical activities, particularly standing, forward leaning, lifting and twisting. AR 383. Dr. Fishell noted that Plaintiff preferred not to take medication at that time. "She is an aggressive worker and she does not like the way medications sometimes interfere with her work." AR 384. Dr. Fishell performed injections in Plaintiff lumbar spine on December 8, 2006. AR 394-401.

Plaintiff was admitted to Southern Hills Hospital and Medical Center on January 31, 2007 for total left knee arthroplasty. AR 224. Plaintiff tolerated the procedure well. During her first postoperative visit on February 12, 2007, Dr. Martin noted that Plaintiff did not have any complaints and was feeling well, although she did have some postoperative soreness. AR 302. On March 19, 2007, however, Plaintiff reported that she was having trouble with range of motion. She was in physical therapy and was unable to achieve great flexion, although she had full extension. Dr. Martin scheduled her for left knee manipulation under anesthesia followed by CPM and physical therapy. AR 303. She underwent the left knee manipulation procedure on April 24, 2007. AR 304. Following her right and left knee replacement surgeries, Plaintiff also underwent physical therapy through April 20, 2007. AR 257-316.

Plaintiff was seen at the Southwest Medical Associates clinic on August 8, 2007 for follow-up regarding her chronic complaints of lumbar pain. AR 371. On August 16, 2007, she discussed a referral to a pain management physician. AR 364. She was thereafter seen on September 20, October 22, and October 31, 2007 in regard to her concern that she was dependent on pain medications. She reported that she had back surgery several years previously, had become addicted to opioid narcotics and had undergone detoxification treatment. Plaintiff discussed her recent history of knee problems and surgery and reported she was currently taking two Percocet tablets at bed time. When she tried to stop the medication, she had symptoms of jitteriness, sweats, diaphoresis and insomnia. Plaintiff reported that the "pain is better in her leg and her back as throughout the day she does not have the pain and does not have any problems, but when she tries to go to bed without taking the medication at night, she develops these symptoms." She also indicated that she had two children at home and did not have time to go through inpatient detoxification. After discussion with the physician's assistant, Plaintiff decided to taper off the medications. AR 324, 359. Plaintiff was prescribed Ambien for her insomnia and clonazapam to

use sparingly for jitteriness and anxiety produced by opioid withdrawal.  Plaintiff completed the tapering-off of her pain medications, but complained of extreme difficulty sleeping as well as having some anxiety.  She also complained of an increase of migraine headaches.  Plaintiff was prescribed different medication for insomnia and was advised to return in 3 to 4 weeks if there was no improvement in her symptoms.  AR 322, 352.  Plaintiff was seen in follow-up on October 31, 2007 for her anxiety.  She reported that she was taking clonazapam, one to two times a day as needed.  She was trying the take the medication as infrequently as possible, but was still having anxiety attacks.  AR 320, 350.  Plaintiff also reported that approximately one week prior to the office visit, her right knee started "locking up."  AR 320, 350.

Plaintiff was seen at the Southwest Medical Associates clinic on April 4, 2008 at which time she reported that she had weaned herself off pain medications and had not been taking them for the past several months.  She had also stopped taking the anxiety medications and reported that her anxiety was well controlled and she no longer had insomnia.  She reported, however, that her low back pain was acting up again.  She had constant right lumbar pain that did not radiate.  AR 348.

Plaintiff was seen by Patrick McNulty, M.D. at the Nevada Orthopedic & Spine Center on April 15, 2008.  AR 317.  Plaintiff complained of right buttock pain that had been ongoing for approximately one and one half years.  Dr. McNulty noted that Plaintiff had previous epidural injections in December 2006 for post laminectomy syndrome.  Dr. McNulty stated: "Actually, this is an interesting finding, because technically, the patient never had a laminectomy.  X-rays reviewed show the patient to have what appears to be internal bone stimulators that have been placed in the interbody regions of the lowest three lumbosacral motion segments with what appears to be anterior interbody fusions."  AR 317.  Under assessment, Dr. McNulty stated: "Right-sided buttock pain, potential SI joint pain.  She does not have central low back pain and appears to have no technical issues of failure of fusion issues with a previous three-level fusion."  Dr McNulty noted that Plaintiff was "fairly active" and was an "avid workout enthusiast although, she avoids any significant twisting or side bending."  Dr. McNulty referred her for pain management and SI joint blocks.  He stated that "at this point in time, there appears to be no structural issues from a

7

spine surgery perspective." AR 317.

Plaintiff saw Dr. Daniel Kim at Southern Nevada Pain Center on June 9, 2008. AR 332. She told Dr. Kim that she started to notice significant pain in the right side of her lower back about two years prior to her visit and that the pain was becoming progressively worse. Dr. Kim stated that Plaintiff appeared to have degenerative changes of the lumbar spine. On June 20 and July 11, 2008, Plaintiff received lumbar facet joint steroid injections and selective transforaminal lumbar epidural steroid injections. AR 328-331. On July 28, 2008, Plaintiff completed a questionnaire in which she indicated that on a daily average her back pain was an 8 on a scale of 0 to 10. She indicated that sleeping made her pain worse and it was worse in the morning and at night. AR 326. Dr. Kim prescribed Percocet to Plaintiff. AR 327.

Plaintiff was seen at the Southwest Medical Associates clinic on September 10, 2008. She stated that she had received "multiple spinal root injections with minimal improvement." AR 338. She felt she was again becoming dependent on pain medication and reported that if she stopped taking the medication, she would become jittery, anxious, nauseous and would have difficulty sleeping. Plaintiff stated that she would again like to taper off the medications. AR 338. On October 6, 2008, Plaintiff reported that since tapering off her medications, she had experienced worsening insomnia. AR 336. On October 16, 2008, she was still have problems with insomnia and anxiety at night because of her efforts to not take pain medications. AR 334.

On December 4, 2008, Dr. Fishell performed a sacroiliac joint injection and four level transforaminal epidural injections at L4-L5. AR 392-393. On December 12, 2008, Dr. Fishell noted that Plaintiff's pain only improved about 50% for two days. AR 373.

Plaintiff was seen by Dr. Jason Garber on January 23, 2009. AR 402-403. Dr. Garber noted that Plaintiff had a roughly six year history of axial mechanical back pain with worsening lower extremity radiculopathy. Plaintiff was having progressive difficulty ambulating and difficulty standing for long periods of time. AR 402. Dr. Garber stated that Plaintiff appeared to have intractable back pain with intermittent radiculopathy and post laminectomy syndrome. He recommended that Plaintiff receive a CT myelogram, plain film x-rays, and an EMG nerve conduction study and stated that he would see her thereafter for further treatment recommendations.

AR 403.

A state agency medical consultant, Mayenne Karelitz, M.D., completed a Physical Residual Functional Capacity ("RFC") Assessment form on March 4, 2009. She stated that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for about 2 hours in an 8-hour work day, sit for about six hours in an 8-hour work day, and had no restriction on pushing and/or pulling. AR 405. Plaintiff could occasionally climb ramps, stairs, ladders, ropes, and scaffolds, could frequently balance, could occasionally stoop, kneel, or crouch, and could never crawl. AR 406.

There is a gap in the medical records in the administrative file from January 2009, when Plaintiff saw Dr. Garber, until February 2012, when she again saw Dr. Fishell. On February 20, 2012, Dr. Fishell noted that Plaintiff "has been suffering from quite a bit of right lower extremity discomfort following a distribution pattern that appears to track along the S1 nerve root on that side. She reports no significant changes in that pain since our last visit with her a couple of years ago." AR 515. Dr. Fishell stated that following the previous injection therapy, he assumed that Plaintiff had seen a surgeon and had the problem resolved. "We now find that she continues to have that same pattern of right lower extremity pain at this time." AR 515. Plaintiff rated her pain as an 8 to 10 on a 0 to 10 scale. She had the pain 24 hours a day and stated that it was made worse by everything. The pain interfered with her daily activities and her sleep. Dr. Fishell recommended that Plaintiff continue on her current medications and prescribed epidural injection therapy. AR 515. On February 21, 2012, Dr. Fishell performed epidural injections in Plaintiff's lumbar spine area. AR 511. Plaintiff reported on March 14, 2012 that she did not receive any relief from this therapy. She also stated that she did not wish to take analgesic medications. Dr. Fishell advised her that a surgical consultation would be the best option. AR 510.

Plaintiff underwent a lumber CT scan at Nevada Imaging Center on March 28, 2012. No significant interval changes were noted in comparison to Plaintiff's previous CT examination on January 22, 2009. AR 427. There was a mild dextroscoliosis of the lumbar spine with minimal retrolisthesis of L1 to L2 and a Grade 1 spondylolysthesis of L5 on S1 with approximately 2 mm of anteroilsthesis. AR 427. She underwent a lumbar spine myelogram on July 20, 2012 which

showed that postoperative changes were demonstrated in the lower lumbar spine with electrode wires present.  AR 422-423.

Plaintiff again saw Dr. Fishell on September 10, 2012 at which time she rated her pain as a 9-10.  Dr. Fishell ordered a right SI Joint injection for diagnostic purposes as recommended by the spine surgeon with whom Plaintiff was consulting.  AR 507.  Plaintiff was seen at the Spine and Brain Institute on November 1, 2012.  She reported a several year history of low back pain and pain radiating into the right posterior thigh and leg.  AR 429.  She was noted to be positive for back, arm, and leg pain.  AR 430.  Plaintiff also had high blood pressure and leg pain while walking.  The physician stated that x-rays and a CT scan showed sclerosis of the SI joints bilaterally.  The physician's assessment was lumbosacral spondylosis without myelopathy.  AR 430.  He recommended that Plaintiff have right SI joint fusion surgery.  AR 431.  On November 21, 2012, Dr. James Forage performed right sacroiliac joint fusion surgery on Plaintiff.  Plaintiff was discharged from the hospital on November 22, 2012.  AR 434-448.  She was seen in follow-up at the hospital on December 5, 2012 and reported that the procedure went "extremely well."  The physician's assistant or physician who saw Plaintiff noted that "[t]he pain she was experiencing prior to surgery is completely gone."  Plaintiff, however, reported some discomfort in her right hip. AR 449.

Plaintiff saw Dr. Fishell on December 19, 2012 for a medication refill.  She was still experiencing some pain and stated that she had gone to the emergency room because of some swelling.  AR 498.  On January 17, 2013, Plaintiff reported to Dr. Fishell that she continued to have pain down her right leg and stated that she would like to try an epidural injection.  AR 495. Plaintiff received the epidural injection on January 22, 2013.  AR 492.  On January 31, 2013, Plaintiff stated that she was still having low back pain and that the epidural injection provided only two days of relief.  She inquired about increasing the level of her pain medication. AR 491.  On February 28, 2013, Plaintiff informed Dr. Fishell that she continued to have low back pain and that Dr. Forage had recommended a spinal cord stimulator trial and permanent implantation if the trial was successful.  AR 488.  Plaintiff was subsequently admitted to St. Rose Dominican Hospital on April 26, 2013 for complaints of pelvic and back pain.  AR 454.  Plaintiff underwent a hysterectomy.

Her doctor advised her that this procedure might not cure her chronic back pain. AR 454. Following the hysterectomy Plaintiff continued to see Dr. Fishell for ongoing low back pain while she waited for authorization to proceed with a spinal cord stimulator. AR 468-482.

A state agency medical consultant, William Dougan, M.D., completed a Disability Determination Explanation form on March 14, 2013. AR 82-84. Dr. Dougan opined that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for about 2 hours in an 8 hour work day, sit for about six hours in an 8-hour work day, and had no restriction on pushing and/or pulling. Dr. Dougan found that Plaintiff could occasionally climb ramps, stairs, ladders, ropes, and scaffolds; could frequently balance; could occasionally stoop, kneel, or crouch; and could never crawl. AR 83.

### C.    Administrative Law Judge's Decision

The ALJ applied the five-step sequential evaluation process established by the Social Security Administration, 20 CFR 416.920(a), in determining whether Plaintiff was disabled. AR 8-10.

Prior to step one, the ALJ found that Plaintiff last met the insured status requirements of the Social Security Act on March 31, 2008. AR 10. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the period from January 15, 2007 through March 31, 2008. AR 10. At step two, he found that Plaintiff had the following severe impairments: osteoarthritis/degenerative joint disease of the lumbar spine, status-post lumbar fusion in 1999; and degenerative joint disease, bilateral knees, status-post bilateral knee replacement (20 CFR 404.152(c)). The ALJ found that Plaintiff suffered from hypertension which was controlled by medications and therefore was not a severe impairment. AR 10. The ALJ also found that Plaintiff's insomnia and anxiety were not severe to the extent they were medically determinable impairments. AR 11. At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526). The ALJ stated that the record did not document or support the level of severity required to meet or medically equal a listing. AR 12.

11

Prior to step four, the ALJ found that through the date Plaintiff was last insured, March 31, 2008, she had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that she could never climb ladders, ropes, or scaffolds and could only occasionally perform all other postural activity.  AR 12.  After summarizing some of Plaintiff's statements and testimony regarding her symptoms and limitations, the ALJ stated that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."  AR 13.

The ALJ stated that following her left knee replacement surgery in late January/February 2007, Plaintiff had done very well with respect to her knees and documented complaints concerning the knees were virtually non-existent.  AR 13.  The ALJ also noted that Plaintiff testified that her knees were okay and she was happy with them.  The ALJ also referenced a medical record from April 2008 which stated that Plaintiff was fairly active and was an avid workout enthusiast.

In regard to Plaintiff's low back, the ALJ stated that she had a reported history of lumbar fusion surgery in 1999 after which she did well.  The records documented "some complaints of low back pain, beginning in late 2006."  AR 13.  The ALJ summarized the x-rays and CT scan reports regarding Plaintiff's lumbar spine which showed a significant amount of scoliosis, osteophyte formation, and some degenerative changes.  He stated, however, that physical examinations had been largely unremarkable and Plaintiff had been neurologically intact.  AR 13.  Plaintiff's medical treatment had been relatively routine and conservative, consisting of routine visits for medication refills and epidural injections.  In October 2007, Plaintiff reported doing well after tapering off pain medications.  The ALJ again stated that in April 2008, just after Plaintiff's last date insured, she was noted to be fairly active and an avid workout enthusiast.  At that time, she had not been taking pain medications for the last few months.  Her anxiety was well controlled and she was no longer having insomnia.  AR 13.

The ALJ further stated that "[b]etween January 2009 and March 2012, a gap of over three

12

years and four years (sic) from after her date last insured, there were no documented complaints or evidence of any treatment in the record."  The ALJ commented:  "Unfortunately, therein lies the problem.  While the claimant may well have more severe problems and/or limitations now. . . , the evidence does not support a finding of disability prior to March 31, 2008, her last date insured.  The ALJ also cited Plaintiff's hearing testimony that her back pain "did not significantly worsen until 2010."  AR 14.

The ALJ afforded little weight to the opinions of reviewing physicians Dr. Karelitz and Dr. Dougan regarding Plaintiff's residual functional capacity.  In particular, he rejected their opinion that Plaintiff was limited to standing and/or walking of at least two hours in an 8 hour workday.  The ALJ stated:

> This restriction was not supported by the objective medical evidence, documented complaints, course of treatment or record as a whole, prior to the date last insured.  As discussed above, documented complaints of knee pain, problems or limitation were virtually non-existent after knee replacement.  In regard to the claimant's low back complaints, prior to her last date insured, physical examinations were largely unremarkable, and treatment was relatively conservative.  As noted above, in April 2008, right around her last date insured, she reported doing relatively well and being fairly active.

AR 14.

Based on his finding that Plaintiff had the residual functional capacity to perform light work, the ALJ found, at step four, that she was capable of performing her past relevant work as a floor housekeeping supervisor and a director of housekeeping.  AR 14.  The ALJ made an alternative finding, at step five, that Plaintiff was capable of performing the light duty jobs of ticket taker, parking lot attendant, and bench assembler for which there were substantial numbers of jobs available in the national economy. AR 15.  The ALJ, therefore, concluded that Plaintiff was not disabled from January 15, 2007 through March 31, 2008.  AR 15-16.

. . .

. . .

. . .

. . .

. . .

1

## DISCUSSION

2

### I.    Standard of Review

3       A federal court's review of an ALJ's decision is limited to determining (1) whether the

4  ALJ's findings were supported by substantial evidence and (2) whether the ALJ applied the proper

5  legal standards. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Delorme v. Sullivan,* 924

6  F.2d 841, 846 (9th Cir. 1991).  The Ninth Circuit has defined substantial evidence as "more than a

7  mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind

8  might accept as adequate to support a conclusion." *Woish v. Apfel*, 2000 WL 1175584 (N.D. Cal.

9  2000) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)); *see also Lewis v. Apfel*,

10  236 F.3d 503 (9th Cir. 2001).  The Court must look to the record as a whole and consider both

11  adverse and supporting evidence.  *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993).  Where the

12  factual findings of the Commissioner of Social Security are supported by substantial evidence, the

13  District Court must accept them as conclusive.  42 U.S.C. § 405(g).  Hence, where the evidence

14  may be open to more than one rational interpretation, the Court is required to uphold the decision.

15  *Moore v. Apfel*, 216 F.3d 864, 871 (9th Cir. 2000) (*quoting Gallant v. Heckler*, 753 F.2d 1450,

16  1453 (9th Cir. 1984)).  *See also Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  The court

17  may not substitute its judgment for that of the ALJ if the evidence can reasonably support reversal

18  or affirmation of the ALJ's decision.  *Flaten v. Sec'y of Health and Human Serv.*, 44 F.3d 1453,

19  1457 (9th Cir. 1995).

20       It is incumbent on the ALJ to make specific findings so that the court need not speculate as

21  to the findings.  *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981) (citing *Baerga v.*

22  *Richardson*, 500 F.2d 309 (3rd Cir. 1974)).  In order to enable the court to properly determine

23  whether the Commissioner's decision is supported by substantial evidence, the ALJ's findings

24  "should be as comprehensive and analytical as feasible and, where appropriate, should include a

25  statement of subordinate factual foundations on which the ultimate factual conclusions are based."

26  *Lewin*, 654 F.2d at 635.

27       In reviewing the administrative decision, the District Court has the power to enter "a

28  judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security,

14

with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  In the alternative, the District Court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Id.*

## II.    Disability Evaluation Process

To qualify for disability benefits under the Social Security Act, a claimant must show that:

(a)    he/she suffers from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less that twelve months; and

(b)    the impairment renders the claimant incapable of performing the work that the claimant previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.

*Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999); *see also* 42 U.S.C. § 423(d)(2)(A).

The claimant has the initial burden of proving disability.  *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir 1995), *cert. denied*, 517 U.S. 1122 (1996).  If the claimant establishes an inability to perform his or her prior work, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful work that exists in the national economy.  *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998).

Social Security disability claims are evaluated under a five-step sequential evaluation procedure.  *See* 20 C.F.R. § 404.1520(a)-(f).  *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001).  The claimant carries the burden with respect to steps one through four.  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).  If a claimant is found to be disabled, or not disabled, at any point during the process, then no further assessment is necessary.  20 C.F.R. § 404.1520(a).  The five steps of the evaluation process are outlined in the ALJ's decision and will not be repeated here. AR 8-10.

## III.    Whether the ALJ erred in determining that Plaintiff had the residual functional capacity to perform light work.

Plaintiff argues that the ALJ failed to properly evaluate the evidence in finding that she had the residual functional capacity to perform light work.  Light work involves lifting no more than 20

pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  20 C.F.R. §404.1567(b).  Social Security Ruling ("SSR") 83-10, 1983 WL 31251 at *6, further states:

> "Frequent" means occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday.  Sitting may occur intermittently during the remaining time.

Dr. Karelitz and Dr. Dougan stated that Plaintiff could stand and/or walk (with normal breaks) at least 2 hours in an 8-hour workday, and could sit (with normal breaks) for a total of about 6 hours in an 8-hour workday.  AR 83, 405.  These assessments placed Plaintiff in the sedentary work category.  *See* 20 C.F.R. §404.1567(a) and SSR 83-10, 1983 WL 31251 at *5.[1]

The ALJ is not bound by any findings made by nonexamining state agency medical or psychological consultants.  Because state agency physicians are recognized as highly qualified physicians, the ALJ must consider their opinions, except with respect to the ultimate determination of whether the claimant is disabled.  20 C.F.R. § 404.1527(e)(2)(i).  In considering the findings of state agency physicians, the ALJ is required to apply the relevant factors listed in the regulation, such as the physician's medical specialty and expertise, the supporting evidence in the case record, and the explanations provided by the physician for his or her opinions.  § 404.1527(e)(2)(ii). The ALJ must explain the weight given to the consulting physicians' opinions and/or his reasons for rejecting those opinions.  SSR 96-5p, 1196 WL 374183 at *3.

Plaintiff argues the ALJ improperly substituted his own medical judgment for that of Dr. Karelitz and Dr. Dougan.   In support of this argument, Plaintiff cites *Day v. Weinberger*, 522 F.2d 1154, 1156 (1975), which held that the hearing examiner erred in going outside the record to consult  medical textbooks for the purpose of making his own exploration and assessment as to

---

[1]Although Plaintiff argues that the Court should remand this case with the direction to pay benefits, Drs. Karelitz's and Dougan's opinions support a finding that Plaintiff could perform work at the sedentary exertional level.  The vocational expert testified that there were sedentary jobs that a person with Plaintiff's background and limitations could perform.  AR 52.  The ALJ, however, did not find that there were sedentary jobs available in the national economy that Plaintiff could perform.  Thus, remand for further hearing would be appropriate if the Court concluded that the ALJ erred in finding that Plaintiff had the residual functional capacity to perform light work.

1    claimant's physical condition; *Nguyen v. Chater*, 172 F.3d 31, 35 (9th Cir. 1999), which stated than

2    an ALJ is not at liberty to ignore medical evidence or substitute his own views for uncontroverted

3    medical opinion; and *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003), which

4    stated that an ALJ may not make independent medical findings regarding whether certain activities

5    are inconsistent with a particular medical diagnosis.  The Commissioner counters that a claimant's

6    residual functional capacity is not a medical issue, but is a dispositive administrative finding that is

7    reserved to the Commissioner and, by delegation, to the ALJ.  20 C.F.R. § 404.1527(d)(2) states

8    that although the Commissioner must consider opinions from medical sources regarding a

9    claimant's residual functional capacity, the final responsibility for deciding this issue is reserved to

10   the Commissioner.  *See also* SSR 96-5p, 1996 WL 374183 at *2.  The Commissioner also cites

11   *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014) which states that "the determination of a

12   claimant's RFC is a matter for the ALJ alone—not a treating or examining doctor to decide."

13        In this case, the ALJ did not render medical opinions that were not supported by opinions of

14   qualified medical sources appearing in the record.  He did not, for example, offer a medical opinion

15   that the degenerative conditions in Plaintiff's lumbar spine could not have caused her low back pain

16   or subsequent radiating pain.  Rather, the ALJ considered the medical evidence and Plaintiff's own

17   statements and testimony regarding the severity of her knee or low back symptoms in deciding

18   whether she had the residual functional capacity to perform light work prior to March 31, 2008.  In

19   making this determination, the ALJ was not bound by the assessments of Dr. Karelitz and Dr.

20   Dougan.  As is typical of RFC assessments provided by state agency medical consultants, neither

21   physician provided a detailed explanation of the basis for her or his assessment.  Although it may

22   be inferred that the physicians assessed Plaintiff's RFC as of the last date she was insured, neither

23   physician explicitly so stated.  Neither physician provided an evaluation of the severity of

24   Plaintiff's symptoms prior to the last date insured as compared to her subsequent condition.

25        The medical records show that Plaintiff complained of increased pain and swelling in her

26   right knee in December 2005.  AR 222.  She subsequently underwent right knee replacement

27   surgery in May 2006 and was ready to return to work by late June 2006.  AR 231-232, 247.  In

28   September, 2006, however, she began experiencing increased pain in her left knee.  Following her

17

1    left knee surgery on January 31, 2007, Plaintiff received post-surgical treatment related to her

2    knee(s) through April 24, 2007. AR 303. As the ALJ noted, there were no reports of ongoing knee

3    symptoms after April 2007 with the exception of one complaint about her knee "locking-up" in late

4    2007. Plaintiff also testified at the hearing that her knees were okay and she was "happy with

5    them." AR 14, 37. The ALJ's determination that Plaintiff did not have significant complaints of

6    knee problems after April 2007 is therefore fully consistent with the medical records and Plaintiff's

7    own testimony.

8         With regard to Plaintiff's low back complaints, the ALJ stated that "prior to her date last

9    insured, physical examinations were largely unremarkable, and treatment was relatively routine and

10   conservative." He also noted that in April 2008, she reported doing relatively well and being fairly

11   active. AR 14. Although the ALJ minimized Plaintiff's complaints of low back pain prior to

12   March 31, 2008, the medical records provide support for his conclusion that Plaintiff's low back

13   pain symptoms had not yet reached such severity as to preclude her from performing light work.

14   At the end of November 2006, Plaintiff saw Dr. Fishell for complaints of low back pain. He noted

15   that Plaintiff preferred not to take medication and was "an aggressive worker" who "[did] not like

16   the way medications interfered with her work." AR 384. On August 16, 2007, Plaintiff discussed a

17   referral to a pain management physician with her primary care provider. AR 364. In September

18   and October 2007, the focus of Plaintiff's concern appeared to shift to whether she was becoming

19   dependent on pain medications and the withdrawal symptoms she was experiencing when she tried

20   to stop taking them. AR 350, 352, 359. On September 20, 2007, she reported that the pain in her

21   leg and her back was better and she did not have pain throughout the day. She stated, however,

22   when she tried to go to bed without taking pain medication she developed symptoms of jitteriness,

23   sweats, diaphoresis, difficulty sleeping, irritability and myalgias. AR 358. By the end of October

24   2007, she had weaned herself off pain medications, but was still experiencing anxiety. AR 350.

25        On April 4, 2008, Plaintiff reported that she had successfully weaned herself off pain

26   medications and had not taken them for the past few months. She had also stopped taking anxiety

27   medications. She stated that her anxiety was well controlled and she no longer had insomnia. AR

28   348. She reported, however, that her back pain was "acting up again." She had constant right

1    lumbar back pain that did not radiate.  She stated that "for the past several months the back pain had

2    been constant waxing and waning with the worst of 9 out of 10."  AR 348.  On April 15, 2008, Dr.

3    McNulty noted that Plaintiff reported ongoing right buttock pain for a year and a half.  He also

4    noted, however, that Plaintiff was "fairly active" and was an "avid workout enthusiast although, she

5    avoids any significant twisting and side bending."  AR 317.  The medical records indicate that

6    Plaintiff's low back condition deteriorated through the remainder of 2008, during which she

7    underwent a series of lumbar epidural injections that provided only brief relief from her symptoms.

8    In January 2009, Plaintiff saw Dr. Garber who noted that she had a roughly six year history of axial

9    mechanical back pain with worsening lower extremity radiculopathy.  Plaintiff was having

10   progressive difficulty ambulating and difficulty standing for long periods of time.  AR 402.  Dr.

11   Garber ordered a CT myelogram, x-rays and nerve conduction studies with the apparent intent of

12   determining whether Plaintiff was a surgical candidate.  As the ALJ noted, however, following

13   Plaintiff's appointment with Dr. Garber, there was a three year plus gap in Plaintiff's treatment

14   records until March 2012 when she returned to Dr. Fishell.  AR 14, 515.  Plaintiff's medical

15   treatment thereafter progressed to sacroiliac fusion surgery on November 21, 2012, after which she

16   continued to experience low back pain.

17       Medical observations made after the period of disability are relevant to assessing the

18   claimant's disability.  *Smith v. Bowen*, 849 F.2d 1222, 1225 (9th Cir. 1988).  The post-March 31,

19   2008 medical records document a substantial worsening of Plaintiff' low back pain and the

20   development of radiating pain.  The Court cannot conclude on this record, however, that the ALJ

21   erred in finding that Plaintiff's low back problems had not reached a level of severity by March 31,

22   2008 such that she was no longer able to perform work at the light exertional level.

23       The ALJ also based his decision on Plaintiff's hearing testimony that her "back pain did not

24   significantly worsen until 2010."  AR 14.  The ALJ's characterization of and reliance on this

25   testimony is questionable.  In response to the ALJ's question as to when her back pain became

26   worse, Plaintiff testified "[m]aybe in 2010.  I really don't know the exact time.  I don't remember,

27   but all the time it's getting worse."  AR 52.  This answer was hardly definitive.  The question and

28   answer also beg the question "worse as compared to what?"  The record indicates that Plaintiff's

1    low back pain increased after April 2008 through January 2009.  Conceivably, her condition

2    continued to worsen after January 2009, although there is a three year gap in the treatment record.

3    In any event, the medical records and Plaintiff's statements in 2007 and the first part of 2008

4    support the ALJ's assessment of her residual functional capacity prior to and as of March 31, 2008.

5        Plaintiff also argues that the ALJ's decision should be reversed because he failed to assess

6    the effect of Plaintiff's obesity on her ability to work in compliance with Social Security Ruling

7    ("SSR") 02-1p.  *Motion for Remand (ECF No. 13), pg. 7.*  SSR 02-1p noted that obesity had

8    previously been deleted as a separately listed impairment in the Listing of Impairments set forth in

9    20 C.F.R. subpart P, Appendix 1.  2002 WL 34686281, at *1.  Paragraphs were added to the

10   musculoskeletal, respiratory and cardiovascular body system listings, however, to provide guidance

11   about the potential effects of obesity in causing or contributing to impairments in those body

12   systems.  "The provisions also remind adjudicators that the combined effects of obesity with other

13   impairments can be greater than the effects of each of the impairments considered separately.  They

14   also instruct adjudicators to consider the effects of obesity not only under the listings but also when

15   assessing a claim at other steps of the sequential evaluation process, including when assessing an

16   individual's residual functional capacity."  *Id.*

17       The National Institutes of Health's clinical guidelines classify overweight and obesity in

18   adults according to Body Mass Index ("BMI") which is the ratio of an individual's weight in

19   kilograms to the square of his or her height in meters.  The clinical guidelines recognize three levels

20   of obesity.  Level I includes BMIs of 30.0-34.9.  Level II includes BMIs of 35.0-39.9.  "Level III,

21   termed 'extreme' obesity and representing the greatest risk for developing obesity-related

22   impairments, includes BMIs greater than or equal to 40. These levels describe the extent of obesity,

23   but they do not correlate with an specific degree of functional loss."  SSR 02-1p, at *2.  "The fact

24   that obesity is a risk factor for other impairments does not mean that individuals with obesity

25   necessarily have any of these impairments.  It means that they are at greater than average risk for

26   developing other impairments."  *Id.*  In assessing an individual's residual functional capacity, SSR

27   02-1p further states:

28   . . .

20

> Obesity can cause limitation of function. The functions likely to be limited depend on many factors, including where the excess weight is carried. An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching. The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers. The ability to tolerate extreme heat, humidity, or hazards may also be affected.
> . . .
> An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time. As explained in SSR 96-8p ("Titles II an XVI: Assessing Residual Functional Capacity in Initial Claims"), our RFC assessments must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule. In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity. This may be particularly true in cases involving sleep apnea.

*Id.*. at *6.

Plaintiff notes that she is 5'1" tall and that medical records show that on April 4, 2008 she weighed 178 pounds which equates to a BMI of 33.6. In August 2007, her BMI was noted to be 32.4. In November 2006, she weighed 171 pounds which equates to a BMI of 32.3. *Motion for Reversal (ECF No. 13), pgs 6-7.* These BMIs placed Plaintiff at Level I obesity. Plaintiff argues that because the ALJ failed to discuss SSR 02-1p or to provide an analysis of her obesity, his decision must be reversed. The Commissioner responds that the ALJ's failure to discuss obesity was harmless error that did not affect Plaintiff's substantial rights. The Commissioner states that "a review of the record fails to reveal any complaints by Plaintiff related to her borderline obesity. And finally, despite Plaintiff's borderline obesity, the record reveals during the hearing, Plaintiff did not complain of any limitations related to her obesity and her representative never mentioned obesity as a reason causing disabling limitations either at the hearing or to the Appeals Council." *Cross-Motion to Affirm (ECF No. 17), pg 7.*

In *Celaya v. Halter*, 332 F.3d 1177 (9th Cir. 2003), the plaintiff, who was illiterate, represented herself at the hearing before the ALJ. The record showed that plaintiff suffered from diabetes and hypertension and that she had a BMI of at least 44 which "well exceeded" the level for

21

"extreme obesity."  The ALJ, however, failed to discuss plaintiff's obesity or the effects thereof on her impairments.  In rejecting the Commissioner's argument that the decision should be affirmed because plaintiff had failed to raise obesity as a disabling factor, the court cited three reasons.  First, obesity was raised implicitly in plaintiff's reports of symptoms.  Second, plaintiff's obesity was close to the listing criterion and was a condition that could exacerbate her reported illnesses. "Third, in light of [plaintiff's] pro se status, the ALJ's observation of [plaintiff] and the information in the record should have alerted him to the need to develop the record with respect to her obesity." The court stated:  "The ALJ's exclusion of obesity from his analysis is error in that he was addressing an illiterate, unrepresented claimant who very likely never knew that she *could* assert obesity as a partial basis for her disability." *Id.* at 1182-83.  The ALJ has a special duty to fully and fairly develop the record and to assure that a claimant's interests are considered, even when the claimant is represented by counsel.  This duty is heightened when the claimant is unrepresented.  *Id.*

In *Burch v. Barnhart*, 400 F.3d 676 (9th Cir. 2005), however, the court rejected plaintiff's argument that the ALJ erred in failing to consider her obesity at step three of the sequential evaluation process and in failing to adequately address plaintiff's obesity in determining that she had the residual functional capacity to perform light work.   The medical records in *Burch* included notations about plaintiff's obesity.  A physician had commented that she was slightly obese and indicated one year later that she had gained 25 pounds in the past few months.  Another physician recommended that plaintiff join a medically supervised weight loss program.  The plaintiff testified at the hearing that she was 5'4" and weighed 215 pounds.  She also testified that her normal weight was 185 pounds, but that she was gaining weight due to stress.  *Id.* at 678.  In holding that the ALJ did not err in failing to consider plaintiff's obesity at step three, the court distinguished *Celaya* on the ground that the record did not indicate that obesity exacerbated plaintiff's other impairments. "More significantly, Burch was represented by counsel.  While this Court mentioned in *Celaya* that even where a claimant is represented by counsel, the ALJ has some burden to develop the record, this court did not specify the perameters of that burden."   The court stated that an ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents some evidence in an effort to

1  establish equivalence.  The court also held that the ALJ adequately addressed plaintiff's obesity in

2  assessing her RFC and vocational ability.  The ALJ noted that plaintiff's physicians indicated that

3  she had gained 25 pounds in two months and was somewhat obese.  He also acknowledged that her

4  obesity likely contributed to her back discomfort.  He concluded, however, that she still had the

5  residual functional capacity to perform light work.

6        In this case, Plaintiff was represented at the hearing by a non-attorney representative, who

7  was an employee of Plaintiff's attorney's office.  AR 8.  Plaintiff's representative did not assert that

8  Plaintiff's obesity was a contributing factor at either the hearing or in the request for review by the

9  Appeals Council.  The medical records also do not make explicit or even implied reference to

10  Plaintiff's obesity as a contributing factor to her knee or back pain.  An August 8, 2007 progress

11  note referenced the BMI score of 32.4, but did not discuss obesity as a factor, or even mention the

12  advisability of weight loss.  AR 372.  There are no indications in the medical records that Plaintiff

13  had experienced significant weight gain or was significantly above her normal weight range.[2]  There

14  were no recommendations that Plaintiff participate in a medically supervised weight loss program.

15  On the contrary, medical reports in 2006 and 2008 refer to Plaintiff being an "aggressive worker,"

16  and an "avid workout enthusiast."  AR 317, 384.  There was no mention in the reports of Dr. Martin,

17  who performed the knee replacement surgeries in May 2006 and January/February 2007, that

18  obesity was a contributing factor to Plaintiff's knee condition or the pain she experienced prior to or

19  subsequent to the knee surgeries.  Dr. McNulty and Dr. Garber, also made no mention of obesity as

20  a contributing factor to Plaintiff low back symptoms.

21        Although Plaintiff's obesity could have been a contributing factor to her knee pain and low

22  back pain, there is nothing in the medical records or Plaintiff's testimony to suggest that it was.

23  Assuming for sake of argument that the ALJ should have addressed Plaintiff's obesity in his

24  decision, the failure to do so was harmless.  "[A]n ALJ's error is harmless when it is

25  'inconsequential to the ultimate nondisability determination.'"  *Molina v. Astrue*, 674 F.3d 1104,

26  1115 (9th Cir. 2012), citing *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th

27

28        [2]Plaintiff's brief states that she gained 7 pounds between November 2006 and August 2008.

1  Cir. 2008), *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) and *Robbins v. Soc. Sec.*

2  *Admin.*, 466 F.3d 880, 885 (9th Cir. 2006).  "In other words, in each case we look at the record as a

3  whole to determine whether the error alters the outcome of the case." *Id.*  Based on the record in

4  this case, an analysis of Plaintiff's obesity would not have reasonably changed the ALJ's RFC

5  assessment.  There is simply no indication in the record that obesity was a contributing factor to

6  Plaintiff's knee or back pain.

7                                                     **CONCLUSION**

8             The ALJ did not err in rejecting the state agency medical consultants' RFC assessments.

9  The ALJ's failure to discuss Plaintiff's obesity in his assessment of her residual functional capacity

10  was, at most, harmless error.  Although the ALJ's decision is open to reasonable doubt, it is, on

11  balance, supported by substantial evidence in the record.  Accordingly,

12                                                 **RECOMMENDATION**

13             **IT IS HEREBY RECOMMENDED** that Plaintiff's  Motion for Remand and/or Reversal

14  (#13) be **denied** and that the Commissioner's Cross-Motion to Affirm the Commissioner's

15  Decision (#14) be **granted**.

16                                                       **NOTICE**

17             Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be

18  in writing and filed with the Clerk of the Court within fourteen (14) days.  The Supreme Court has

19  held that the courts of appeal may determine that an appeal has been waived due to the failure to file

20  objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has

21  also held that (1) failure to file objections within the specified time and (2) failure to properly

22  address and brief the objectionable issues waives the right to appeal the District Court's order

23  and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153,

24  1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

25             DATED this 28th day of September, 2016.

26

27                                                        _____

28                                                        GEORGE FOLEY, JR.
                                                          United States Magistrate Judge